In the Matter of Joseph
GIBBS, Debtor.

Edward WEIMER,
Administrator, Plaintiff,

v.

Joseph GIBBS, Defendant.

Bankruptcy No. 1–83–01168.

Adv. No. 1–83–0450.

United States Bankruptcy Court,
S.D. Ohio, W.D.

Aug. 9, 1984.

Robert E. Taylor, Cincinnati, Ohio, for plaintiff.

Robert A. Goering, Cincinnati, Ohio, for defendant.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter 7 adversary proceeding arises out of a tragic automobile accident which occurred on July 28, 1980 in Cincinnati, Ohio. The plaintiff, administrator of the estate of the deceased victim of the accident, has brought this complaint seeking to have a wrongful death judgment of $296,314 declared nondischargeable on the grounds that the judgment arises from a willful and malicious injury under 11 U.S.C. § 523(a)(6). Pursuant to the June 1, 1984 trial on the merits, the Court hereby issues the following findings of fact, opinion and conclusions of law.

### Findings of Fact

1. The events leading up to the death of Lawrence Weimer began on July 27 with a modest evening on the town. Gibbs' intent was to cheer up his 18 year old daughter, who was under psychiatric care and was in a state of despondency. They had dinner at a McDonald's restaurant at approximately 8:00 p.m., and then proceeded to the 1101 Bar located on Reading Road in Reading, Ohio, where live entertainment was being offered. According to Gibbs, he consumed four to five beers between 9:45 p.m. and 12:00. He and his daughter departed from the 1101 Bar at 1:30 a.m. From there they travelled south on Reading Road for ten to fifteen minutes until they reached the intersection of an east-west highway known as the Norwood Lateral.

2. While the streets were dry that night, Gibbs claims that visibility was less than ideal due to a light fog in the area and a very dark night. Gibbs intended to turn left onto the east-bound entrance ramp of the Norwood Lateral, which is located just south of the point where the highway passes over Reading Road. Instead, he turned left at a traffic light located just north of the overpass, and entered the westbound exit ramp of the highway.

Apparently Gibbs either did not see or did not heed a one-way sign pointing in the opposite direction which was hanging from the cable elevating the traffic lights, nor the one-way sign and the "Do Not Enter" signs positioned at the mouth of the exit ramp. In addition, a view of the premises (conducted with consent of counsel) re-

vealed two "Wrong Way" signs posted approximately ¼ of the way up the ramp. The odd angle of his turn onto the ramp also did not alert him to his error (Pl.Ex. 17).

3. The undisputed testimony of Norwood police officer Michael Wheeler indicates that the westbound exit ramp which Gibbs entered is approximately .1 mile long. Gibbs stated that he realized he was headed the wrong way after he had travelled approximately one-half the distance of the ramp, which he says took 6 to 8 seconds. He further stated that he hit his brakes as soon as he realized his error, but that it was too late to avoid colliding with Weimer's car.

The circumstantial evidence does not support this version of the accident. According to Wheeler, Gibbs' car collided with Weimer's as Weimer was travelling westbound in the left lane. The collision occurred approximately one-third of a mile from the point at which Gibbs' car entered the exit ramp (Pl.Ex. 1). Thus, Gibbs must have travelled .2 of a mile into the westbound traffic and across the right lane of the highway before the collision occurred. The Court can only conclude that he was travelling at a high rate of speed, or that he simply was not in complete control of his senses, when the fatal crash occurred.

4. Immediately after the crash, Gibbs went to the victim's car. The collision had jarred Weimer into the back seat of his vehicle, and Gibbs attempted to hold him upright to help the unconscious victim breathe. Wheeler arrived on the scene a short time later. His initial observation of Gibbs suggested intoxication. He reported Gibbs as being thick-tongued, having an unsteady gait, and having a moderate odor of alcohol on his breath. He passed certain manual performance tests, but scored 0.133 on an intoxilyzer test. Under Ohio law, a 0.10 score constitutes legal intoxication. (Pl.Ex.6). Significantly, the intoxilyzer test was not administered until 2:50 a.m., almost three hours after Gibbs claims that he drank his last beer.

5. On December 9, 1980, Gibbs pleaded guilty to a charge of Vehicular Homicide under Ohio Revised Code § 2903.07. On April 14, 1983 he entered into a consent judgment pursuant to plaintiff's filing of a wrongful death complaint on September 18, 1980.

### Opinion

While each of the statutory exceptions to dischargeability set forth in 11 U.S.C. § 523 poses its own special set of mental challenges for a deciding judge, none is quite so laden with historical baggage and linguistic (if not metaphysical) difficulties as the "willful and malicious injury" standard of § 523(a)(6).

A review of the substantial body of case law on this subject confirms that a precise definition of these words has yet to be devised.

Indeed, there is substantial disagreement among the authorities as to the meaning and application of these words in the bankruptcy context, let alone in other fields of law. The legislative history of the statute states that:

"[W]illful" means deliberate or intentional. To the extent that *Tinker v. Colwell*, 139 [193] U.S. 473 [24 S.Ct. 505, 48 L.Ed. 754] (1902), held that a looser standard is intended, and to the extent that other cases have relied on *Tinker* to apply a "reckless disregard" standard, they are overruled.

House Report No. 95–595, 95th Cong., 1st Sess. 365 (1977), U.S. Code Cong. & Admin. News 1978, 5787, 6320.

Some courts have interpreted this legislative mandate to require merely an intentional act which causes injury (*In re Capparelli*, 33 B.R. 360, 364–365 (Bankr.S.D.N.Y.1983); *In re Rice*, 18 B.R. 562, 564 (Bankr.N.D.Ala.1982)), while others have held that the act must be committed with the intent to cause the injury (*In re Quezada*, 718 F.2d 121 (5th Cir.1983); *In re Cecchini*, 37 B.R. 671, 10 C.B.C.2d 744 (Bankr. 9th Cir.1984)).

This split of authority is particularly evident in cases such as this one. Some cases hold that the intentional act of becoming

legally intoxicated is sufficient to find that the injuries resulting from the operation of a motor vehicle in such condition are willful and malicious. Most notable among those cases is *In re Greenwell,* 21 B.R. 419 (S.D. Ohio 1982). *See also, In re Wooten,* 30 B.R. 357 (Bankr.N.D.Ala.1983). Other Courts have held that the mere fact of intoxication is not sufficient to meet the burden of proof under § 523(a)(6). *See, e.g., In re Bryson,* 3 B.R. 593 (Bankr.N.D. Ill.1980).

While we would not apply the "intentional act" standard of *Greenwell* in every case brought under § 523(a)(6), we believe that public policy amply justifies the imposition of that rule where injuries result from motorists who are legally intoxicated. When a person voluntarily becomes intoxicated and then operates a motor vehicle, he automatically puts himself and the public at large in severe peril. A quotation of statistics is unnecessary; the point is self-proving. Having created the peril, the defendant should be deemed to intend all that follows.

We do not doubt that defendant did not intend to travel up the westbound exit ramp, and that he did not intend to collide with the decedent's automobile. However, had defendant not been intoxicated, he might have seen the "Do Not Enter" and "One Way" signs which were clearly posted, and almost certainly would have recognized his error long before he had travelled a third of a mile in the wrong direction and into the left lane of oncoming traffic. Having assumed the peril of driving while intoxicated, he should be held to answer for the injury he caused.

This holding is not only in accord with *Greenwell,* but also with a new exception to discharge which was signed into law on July 10, 1984. Section 523(a)(9) declares nondischargeable any debt which:

> arises from a judgment or consent decree entered in a court of record against the debtor wherein liability was incurred by such debtor as a result of the debtor's operation of a motor vehicle while legally intoxicated under the laws or regulations of any jurisdiction within the United States or its territories wherein such motor vehicle was operated and within which such liability was incurred....

The defendant argues that the legislative history of this new provision demonstrates that Congress did not intend to have § 523(a)(6) apply to cases such as this absent a finding that injuries were intentionally inflicted. We cannot agree. First, we are hesitant to divine the intent of Congress based upon the comments of two Senators, quoted by counsel, however esteemed they may be. Second, from the statement of Senators DeConcini and Heflin, it is possible to conclude that Congress intended to overrule by statute those decisions which failed to adhere to the original intent of § 523(a)(6). Some support for this proposition is found in the remarks of Congressman Rodino made while introducing the Conference Report on H.R. 5174:

> Subtitle D *clarifies present law* relating to the nondischargeability of debts incurred by drunk drivers. Debts incurred by persons driving while intoxicated are presumed to be willfully and maliciously incurred under this provision. 130 Cong. Rec. H7489 (daily ed. June 29, 1984) (emphasis added)

Finally, we are reluctant to give great weight to the comments of legislators enacting a new provision in determining the Congressional intent behind a law now nearly six years old. The statement of Justice Harlan in *U.S. v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960) is certainly apt here:

> [T]he views of subsequent Congress form a hazardous basis for inferring the intent of an earlier one.

For the reasons stated above, we are compelled to find in favor of the plaintiff.

### Conclusions of Law

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 157 as enacted on July 10, 1984.

2. The debt of $296,314 owed by defendant to plaintiff arose out of a willful and malicious injury to the plaintiff's decedent,

and is therefore nondischargeable under 11 U.S.C. § 523(a)(6).

3. It is therefore ORDERED that judgment be rendered in favor of the plaintiff.

IT IS SO ORDERED.